UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHEILA E. JAY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SERVICE EMPLOYEES INTERNATIONAL UNION - UNITED HEALTH CARE WORKERS WEST, et al., <br><br> Defendants. | Case No. 16-cv-01340-EMC <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> Docket No. 82 |

Plaintiff Sheila Jay brought this case against Defendant International Union of Operating Engineers – Stationary Engineers Local 39 ("IUOE" or "the Union"), asserting a claim for violation of the duty of fair representation under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Pending before the Court is the Union's motion for summary judgment. Docket No. 82. For the following reasons, the Court **GRANTS** the Union's motion.

## I. INTRODUCTION AND FACTUAL BACKGROUND

A. <u>Ms. Jay's Work At Kaiser and Transition into Biomedical Engineer Technician Role</u>

Ms. Jay is a former employee of Kaiser Foundation Hospitals, Inc. ("Kaiser"). Ms. Jay initially worked in the position of Radiological Film Processor II, and was represented by a different union, SEIU-United Healthcare Workers West. (Tom Decl. ¶ 3, 6; See Lopez Decl. Ex. A [Jay Deposition] 66:6-22). In January 2013, Ms. Jay transferred into a Biomedical Engineer Technician position ("BET") at Kaiser's Oakland Medical Center, where she was represented by Defendant IUOE. Jay Depo. 31:20-32:8; Tom Decl. ¶ 7. The BET position was a temporary training program intended to train employees for ultimate placement in the position of Biomedical Engineer. Docket No. 85 (Tom Decl.) ¶ 9. As described in the parties' 2012 CBA, under normal

circumstances, applicants to the BET position were required to have an Associate's Degree in electronics, four years of experience working in a highly skilled electronic service job, and an unrestricted California driver's license. Docket No. 86 (Eggen Decl.) Ex A (2012 CBA).

Ms. Jay and three other Radiological Film Processors (including Mr. Jason Ponce), entered into a Letter of Agreement accepting a transfer into the BET program. Docket No. 83 (Lopez Decl.) Ex. B ("Letter of Agreement" or "LOA") at 1. Under the terms of the LOA, Kaiser agreed to waive the prerequisites of an Associate's Degree and four years of experience in a comparable skilled position. *Id.* The LOA provided that the BETs would be required to obtain an Associate's Degree within 24 to 30 months, and that they could be considered for a 12 month extension if they completed 75% of the required coursework for the degree by month 24:

> Affected employees will be required to obtain an Associate degree or Bachelors degree as above within the twenty-four (24) to thirty (30) month training period for the position. In circumstances where an employee has demonstrated diligent effort and progress toward attaining the required degree, but has still been unable to complete the degree by the end of the defined training period, the period allowed for completion of the degree may be extended, provided all other required qualifications and performance objectives for BET are met in the established training period. An employee will need to demonstrate completion of 75% of course work for the required degree by the end of the twenty-fourth month of the BET training program, in order to be considered for an extension of time to complete the degree. The maximum extension of time that may be allowed will be twelve (12) months beyond the thirty (30) month maximum for the training period.

LOA at 3. Additionally, the attachment to the LOA states, in capital letters:

> FAILURE TO SUCCESSFULLY COMPLETE THE PROGRAM WITHIN A THIRTY (30) MONTH PERIOD WILL RESULT IN TERMINATION.

LOA at 8. The same warning is included in Appendix VIII to the 2012 CBA, which sets forth the standard position requirements for BETs including the timeline set forth in the LOA. Gong Decl. Ex. B at 46.

Ms. Jay signed the LOA on January 15, 2013. *Id.* at 3. She also signed an individual agreement which again set forth the same educational requirements on January 16, 2013. Lopez Decl. Ex. C.

For each of the BETs who signed the LOA, Kaiser elected to lower the educational

requirement from an Associate's Degree to a Certificate in Electronics. Tom Decl. ¶ 12. Ms. Jay acknowledges that she was required to obtain a Certificate in Electronics, and that she agreed to those terms. Lopez Decl. Ex. A (Jay Deposition) 92:23-93:10; 94:5-9; 119:1-7; 128:15-18; 149:12-18. The time deadlines set forth in the LOA still applied.

B. <u>Ms. Jay's Efforts to Obtain a Certificate in Electronics</u>

To complete this requirement, at the direction of Mr. Craig Finley (Director of Service), Ms. Jay initially enrolled in an online certificate program at the Cleveland Institute of Electronics ("CIE"). The CIE program required students to complete two modules, each consisting of approximately 107 levels, to obtain the certificate; Ms. Jay completed only two out of 107 levels in one of the modules before dropping out because the program was too expensive. Jay Depo. 21:1-8; 22:21-23:9. In August 2013, Ms. Jay informed Mr. Finley that she planned instead to begin a four-semester program at Laney College, commencing in January 2014; she alleges that he did not object. Jay Decl. ¶ 33.

In January 2014, Ms. Jay began the Laney program, which required her to complete thirty units in eleven specified courses. Lopez Decl. Ex. F. On April 15, 2014, Mr. Glen Marrow, the BET Committee Coordinator, sent Ms. Jay a letter informing her that she had made insufficient progress in her educational requirements to qualify for a scheduled pay increase, and warned that "time is running short to complete the program" within the 30 month deadline. Lopez Decl. Ex. G. Before and after this letter, Ms. Jay alleges that she informed Mr. Finley and Mr. Marrow of her progress at Laney and the courses she took each semester. Jay Decl. ¶ 33 ("At the beginning and end of each semester I discussed my courses with them."). Ms. Jay did not respond to or object to the letter.

By the 24-month deadline to qualify for an extension, March 2015, Ms. Jay had completed only eleven of the thirty required units in the Laney program. Lopez Decl. Ex. E. Ms. Jay had also taken a three unit pre-algebra course at Laney College, but this did not count directly to her degree program. Jay Depo. 101:10-102:11; Lopez Decl. Ex. F (Laney Certificate Curriculum). Ms. Jay tried to transfer credit hours from the Cleveland Institute, but Laney College would not recognize them. Jay Depo. at 184.

3

C. The February 2015 Performance Evaluation

In February 2015, Ms. Jay received a performance evaluation from her manager, Mr. Michael Vallis. Jay Decl. ¶ 4, Ex. 1 at 1 (Docket No. 90-1). The performance evaluation states that Ms. Jay "maintains competency in the technical skills and knowledge for this position," "keeps her skills and knowledge up to date," "participates in department education/training and continuing educational opportunities as required," and that she "[m]eets" expectations to "[m]aintain[] continuing education as required." *Id*.

D. Ms. Jay's Failure to Complete Educational Requirements and Termination

In September 2015, Ms. Jay received a letter from Kaiser informing her that she would be terminated for failing to meet the educational requirements of the BET position. Lopez Decl. Ex. J. After receiving the letter, Ms. Jay contacted the Union and spoke with Mr. Mark Gong, the IUOE Business Representative. Lopez Decl. Ex. M (Gong Deposition) at 118. After Ms. Jay sent Mr. Gong the LOA, Mr. Gong asked Ms. Jay whether she had completed her educational requirements by the 30 month deadline; Ms. Jay conceded that she had not. Gong Depo. 247:7-20. When she was terminated in October 2015, Ms. Jay had completed only 53% of the required units at Laney. Lopez Decl. Ex. E (Laney Transcript); Lopez Decl. Ex. F (Laney Certificate Curriculum). Ms. Jay has asserted that another BET, Mr. Jason Ponce, was given an extension of time to complete his educational requirements, but in her deposition she concedes that she does "not know that factually." *Id.* at 212. Hence, there is no admissible evidence that Mr. Ponce was afforded exceptional treatment relative to Ms. Jay.

On October 2, 2015, Ms. Jay and Mr. Gong met with Mr. Craig Finley, the Director of Service for Kaiser, and Mr. Glen Marrow, the BET Committee Coordinator, to discuss Ms. Jay's employment. Jay Depo. 163:21-164:18; Gong Depo. 186:25-187:8; Gong Decl. ¶¶ 9, 10. Mr. Finley determined that Ms. Jay had not met the educational requirements of the BET program, and he stated that Ms. Jay's Cleveland Institute credits could not be counted because Ms. Jay had failed to complete a full module. Jay Depo. 164:7-10. Mr. Gong asked Kaiser to consider placing Ms. Jay into a Biomedical Assistant position in lieu of termination. Gong Depo. at 174.

At a second meeting on October 15, Mr. Finley gave Ms. Jay a letter stating that there were

1 no vacancies for that position, and that she would be terminated effective October 16. Jay Depo. 153:3-8; Lopez Decl. Ex. L (Oct. 15, 2015 Letter). After the meeting, Ms. Jay and Mr. Gong spoke briefly, and Mr. Gong asked Ms. Jay if there was anything further he could do for her. Gong Depo. 292:4-8; Gong Decl. ¶ 16. Ms. Jay responded in the negative, and stated that, as far as she was concerned, the Union no longer represented her. Gong Decl. ¶ 16; Jay Depo. 154:20-23. Ms. Jay never requested that Mr. Gong file a grievance on her behalf. Jay Depo. 154:20-23; Gong Depo. 288:12-18.

Approximately seven months later, in May 2016, Ms. Jay completed the Laney program and obtained her Certificate in Electronics. Jay Decl. ¶ 22.

E. The 2012 and 2015 Collective Bargaining Agreements

The 2012 CBA was set to expire in 2015. During the summer and fall of 2015, Kaiser and the Union were in negotiations for a successor agreement. On September 30 or October 1, 2015, the Union's membership ratified the new 2015 CBA, which was made retroactive to September 18, 2015. The 2015 CBA eliminated the BET program; both Kaiser and the Union have stated that this measure was not intended to affect any current BETs, but rather to stop the program going forward, and thus not to hire any additional BETs. Docket No. 86 (Eggen Decl.) ¶ 7; *id.* Ex. C; Tom Decl. ¶ 16. Nothing in the 2015 CBA suggests otherwise.

## II. DISCUSSION

A. Legal Standard

"Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (citing *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) (quoting *R.W. Beck & Assocs. v. City & Borough of Sitka*, 27 F.3d 1475, 1480 n.4 (9th Cir. 1994)).

"A moving party without the ultimate burden of persuasion at trial" – such as the Union in this case – nonetheless "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party may discharge its initial burden by "show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Friedman v. Live Nation Merch.*, Inc., 833 F.3d 1180, 1188 (9th Cir. 2016) (quoting *Nissan Fire*, 210 F.3d at 1102). Where "a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* (quoting *Nissan Fire*, 210 F.3d at 1102). The ultimate question at summary judgment is whether "the record taken as a whole could . . . lead a rational trier of fact to find for the non-moving party"; if not, then "there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968)); *see also Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005).

Under Section 301 of the Labor Management Relations Act ("LMRA"), "[a] union owes a duty of fair representation to those it represents, and an employer must honor the terms of a CBA to which it is a party." *Bliesner v. Commc'n Workers of Am.*, 464 F.3d 910, 913 (9th Cir. 2006). When these duties are violated, "[a]n aggrieved party may bring a hybrid fair representation/§ 301 suit against the union, the employer, or both. In order to prevail in any such suit, the plaintiff must show that the union and the employer have both breached their respective duties." *Id.* Thus, "[w]hether the defendant is the union or the employer, the required proof is the same: The plaintiff must show that there has been both a breach of the duty of fair representation and a breach of the CBA." *Id.* at 913-14. In order to defeat summary judgment, therefore, Ms. Jay must establish a triable issue of material fact as to *both* whether the employer breached the terms of the CBA *and* whether the union breached its duty of fair representation.

B. <u>Analysis</u>

    1. <u>Employer's Breach of Collective Bargaining Agreement</u>

Both the 2012 and 2015 CBAs state that Kaiser may not fire an employee without "just

cause." Gong Decl. Ex. A (2015 CBA) at 4; Ex. B (2012 CBA) at 4. "Just cause" means "a real cause or basis for dismissal as distinguished from an arbitrary whim or caprice; that is, some cause or ground that a reasonable employer, acting in good faith in similar circumstances, would regard as a good and sufficient basis for terminating the services of an employee." Ninth Circuit Manual of Modern Jury Instructions, LRMA § 301, p. 281. *See also Cotran v. Rollins Hudig Hall Intern., Inc.*, 17 Cal.4th 93, 108 (1998) ("good cause," like "just cause," means "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual").

Although neither CBA defines "just cause," the LOA Ms. Jay signed with Kaiser upon transfer to the BET position clearly required her to complete the educational requirements within 30 months or else be terminated. *See* LOA at 8. Further, it clearly stated that a single extension of 12 months would be considered only if 75% of the required coursework was successfully completed within 24 months. *See* LOA at 3. Ms. Jay has made no claim that these educational requirements themselves are invalid or unreasonable. Thus, unless her performance is excused, Ms. Jay's failure to timely meet the educational requirements of the LOA and 2012 CBA would provide just cause for her termination.

### a. Ms. Jay's Arguments

Ms. Jay does not dispute she failed to obtain the Certificate within the 24-30 month deadline. Instead, she argues there is a triable issue of material fact as to whether she in fact had completed 75% of the education requirement by the 24-month deadline under the LOA March 2015 – which would have entitled her to a 12 month extension. However, this argument lacks any evidentiary support sufficient to create a triable issue of fact. To meet the 75% benchmark, Ms. Jay would have had to complete 22.5 units by March 2015. However, her transcript at Laney College demonstrates that by March 2015 she had only completed 11 units. *See* Lopez Decl. Ex. E. Six units were still in progress that semester, *id.*, but Ms. Jay concedes that, as of March 2015, they were not complete. Jay Depo. 187:16-188:4. Ms. Jay argues this calculation is erroneous because it excludes a three-unit pre-algebra course and six units of credits she had already earned at the Cleveland Institute of Electronics before starting the Laney program. Even if this were true,

7

however, Ms. Jay would still only have completed 19 units, which falls short of the 22.5 unit requirement. Moreover, her calculation is not credible: Ms. Jay concedes that the pre-algebra course was not one of courses qualifying for a Certificate in Electronics, Jay Depo. 101:10-102:11, and Ms. Jay presents no basis whatsoever for the conversion of 2 out of 107 levels she completed at CIE (out of only one of two modules) into 6 units at Laney. Ms. Jay also argues that 47 units of coursework she took at Merritt College, Alameda College, and Laney between 1989 and 2005 should be counted, but there is no evidence suggesting those courses count toward her Certificate in Electronics. Further, as the Union correctly points out, Ms. Jay's own contemporaneous notes, which she shared with Mr. Gong and Kaiser representatives at the October 2, 2015 meeting, show that, at best, she completed only 20 units by March 2015. Lopez Decl. Exh. K.

Ms. Jay also argues that Kaiser lacked just cause because the 2015 CBA – which was not ratified until September 30 – somehow absolved her of her obligations under the LOA to complete her educational requirements by August 31. Ms. Jay presents no evidence, other than her subjective opinion, that the 2015 CBA somehow eviscerated her obligations set forth in the LOA. On its face, the 2015 CBA says nothing of the sort. Ms. Jay infers that she was absolved of her requirements because the 2015 CBA eliminated the BET role altogether. But the Union has presented declarations from representatives of both the Union and Kaiser stating that the change was intended only to eliminate the BET program going forward, and not to affect anyone still in the program; it was not intended to eliminate the already relaxed educational requirements of the LOA. Eggen Decl. ¶ 7; Exh. C; Tom Decl. ¶ 16. As the Union rightly points out, in interpreting a CBA, the parties' intentions control. *See M & G Polymers USA, LLC v. Tackett*, 135 S.Ct. 926, 933 (2015). Absent any evidence that the parties intended otherwise (or anything in the text of the agreement), Ms. Jay's argument lacks merit.

Ms. Jay also argues that Kaiser discriminated against her on the basis of her race, based on her assertion that Mr. Jason Ponce – another BET – was given additional time to complete the educational requirements while she was not. However, the only evidence she cites to substantiate the allegation is her declaration, which contradicts her deposition testimony conceding that she had no knowledge as to whether Mr. Ponce was in fact given such an extension. Jay Depo. at 212.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985). Because Ms. Jay presents no evidence of Kaiser's alleged discrimination other than her own inconsistent declaration, there is no triable issue of fact on this point. There is no competent evidence Kaiser made exceptions to the requirements in the LOA.

Ms. Jay also argues that she had obtained the "equivalent" of an Associate's Degree by the end of the 30-month program, thus meeting the LOA's initial requirements. However, she presents no evidence that she had obtained such an "equivalent."

### b. The Modification/Waiver/Estoppel Defense

The closest Ms. Jay comes to a credible legal argument against summary judgment is one that she does not actually assert, but which might arise from some facts in the record. In particular, Ms. Jay claims her supervisors did not object when, in August 2013, she informed them that she would begin a four-semester program at Laney in January 2014, which would not have ended until after the August 31, 2015 deadline. Ms. Jay also claims she met with her supervisors at the beginning of every semester to share her course progress, suggesting that they were aware but did not object. This essentially suggests waiver, estoppel, or modification of contract, thus relieving her of the LOA education requirement. This argument was not advanced by Ms. Jay (and hence not briefed by the parties). Although any such argument was effectively waived by Ms. Jay,[1] the Court analyzes the issue out of an abundance of caution and concludes that the record cannot in any event support any such argument.

Under California law, a written contract can be modified by conduct inconsistent with the

---

[1] *Cf. U.S. v. Kimble*, 107 F.3d 712, 715 n.2 (9th Cir. 1997) (deeming argument abandoned where it "was not coherently developed in [party's] briefs"); *John-Charles v. California*, 646 F.3d 1243, 1247 n.4 (9th Cir. 2011) (noting that party "failed to develop any argument on this front, and thus has waived it").

terms of the contract or even by oral statements that result in prejudicial reliance. *See*, *e.g.*, *Wagner v. Glendale Adventist Medical Ctr.*, 216 Cal.App.3d 1379, 1388 (1989) ("When one party has, through oral representations and conduct or custom, subsequently behaved in a manner antithetical to one or more terms of an express written contract, he or she has induced the other party to rely on the representations and conduct or custom. In that circumstance, it would be equally inequitable to deny the relying party the benefit of the other party's apparent modification of the written contract."); *Daugherty Co. v. Kimberly-Clark Corp.*, 14 Cal.App.3d 151, 158 (1971) ("An agreement to modify a written contract will be implied if the conduct of the parties is inconsistent with the written contract so as to warrant the conclusion that the parties intended to modify it.").

Similarly, the doctrine of "[e]stoppel is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts." *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café & Takeout III, Ltd.*, 30 Cal.App.4th 54, 59 (1994). Estoppel requires showing that "(1) the party to be estopped must know the facts; (2) [h]e must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his injury." *Id.* (quotation and citation omitted). *Cf. Wade v. Markwell & Co.*, 118 Cal.App.2d 410, 419-20 (1953) (plaintiff pawned her fur coat and, although written agreement required recovery within thirty days, court held that defendant's oral representations that she could reclaim coat after deadline estopped defendant from arguing the writing governed).

Finally, the doctrine of waiver refers to "the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only." *DRG/Beverly Hills*, 30 Cal.App.4th at 59. This is a difficult standard to meet because "[w]aiver always rests upon intent," and the burden "is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation." *Id.* (quotation and citation omitted).

The record in this case does not support any of these theories. Ms. Jay only makes one

specific allegation backed by a declaration: in August 2013, she informed Mr. Finley and Mr. Marrow that she intended to begin a 4-semester program at Laney College in January 2014. Jay Decl. ¶ 33 ("Both Finley and Marrow had no problem with me starting at Laney in January, 2014. When the semester began I again informed Finley and Marrow of the courses I was taking. They approved of the courses."); *id.* ¶ 34 ("As [of] August, 2013, Finley and Marrow knew that I would not complete the Laney College certificate degree until May, 2016."). Even if assumed to be true, this would not be sufficient to modify the LOA or provide a basis for estoppel or waiver; Ms. Jay does not allege Mr. Finley and Mr. Marrow knew as of August 2013 that she would not be able to complete 75% of the coursework by March 2015. Further, there is no evidence in the record suggesting that Mr. Finley or Mr. Marrow knew that Jay's CIE credits would be non-transferable as of August 2013. In fact, the only evidence in the record suggests otherwise: Ms. Jay testified that Mr. Finley asked her at the October 2, 2015 meeting concerning her termination if she could transfer the CIE credits to Laney College, suggesting that he was not aware earlier that it would be impossible. *See* Jay Depo. 185:15-186:3. Nor does Ms. Jay allege she took any particular course of action to her detriment in reliance upon the 2013 meeting. Moreover, any effect of the August 2013 meeting is largely vitiated by the April 15, 2014 letter that Kaiser sent to Ms. Jay which clearly stated, in relevant part:

> The letter of agreement clearly states that in order for a BET candidate to receive for [sic] wage increases and to continue to be employed after the 30 months, all phases of the program must be met. At this time, you will need to demonstrate your commitment to the program before any adjustments can be made. The time is running short to complete the program.

Lopez Decl. Ex. G.[2] Thus Ms. Jay cannot rely on what happened in August 2013 ultimately to excuse compliance with the LOA given the clear message of the April 15, 2014 letter reiterating her obligation. As noted above, Ms. Jay did not respond or object to the letter.

After the April 15, 2014 warning letter, the only support for Ms. Jay's possible argument excusing her from the LOA requirement is a vague statement in her declaration that "[a]t the

---

[2] Ms. Jay claims she does "not recall receiving Marrow's letter dated April 15, 2014," Jay Decl. ¶ 34, but her signature appears acknowledging receipt on May 5, 2014. Lopez Decl. Ex. G.

11

beginning and end of each semester I discussed my courses with [Finley and Marrow]" and "[n]ot once during any [of] those discussions did either of them tell me that there was no point in continuing because I would not complete 75% of the course work before March, 2015." Jay Decl. ¶ 33. But that Ms. Jay "discussed her courses" each semester does not establish that she also discussed whether she would be able to meet the 75% threshold, or anything at all about her overall progress towards completing the program. Further, Ms. Jay does not state that Mr. Finley and Mr. Marrow made any kind of affirmative statement or gave any assurance that suggested the LOA was no longer in effect. Indeed, Ms. Jay does not even establish purposeful approval by Mr. Finley and Mr. Marrow implicit or otherwise.[3] That neither said "there's no point in continuing because you won't complete the program," says nothing about the context of the meeting, what they did say, what they knew at the time, and what they intended. Nor does it show she could have reasonably relied on their failure to say "there was no point in continuing"; she could not reasonably assume the LOA, the 2012 CBA, and the warning letter of April 15, 2014 were all revoked absent any clear statement or documentation of such.

Finally, Ms. Jay points to a February 2015 performance appraisal by her manager Mr. Michael Vallis – just one month before the 24-month deadline and seven months before the 30-month deadline – stating that she "[m]eets" expectations to "[m]aintain[] continuing education as required." *Id*. Jay Decl. ¶ 4, Ex. 1 at 1 (Docket No. 90-1). However, Ms. Jay has not presented any evidence that Mr. Vallis – unlike Mr. Finley and Mr. Marrow – was one of the Kaiser supervisors who did, would, or should have known about her progress in the Certificate in Electricity program. Nor has she presented evidence that her progress in the Certificate in Electricity program (as opposed to the in-house educational training at Kaiser) was within the purview of the performance evaluation.

Accordingly, on this record, Ms. Jay has not met her burden to demonstrate a triable issue of material fact with respect to whether Kaiser breached the CBA. There is no factual basis for

---

[3] Furthermore, it is not clear whether the supervisors alleged to have consented to the progress of Ms. Jay's studies – Mr. Finley and Mr. Marrow – would have had the legal authority to waive the 30-month requirement provided for in the contract.

1 finding such a breach.

### 2. Union's Duty of Fair Representation

Even if Ms. Jay could show a triable issue with respect to whether Kaiser had just cause to terminate her, however, she would also have to demonstrate a triable issue with regard to the Union's duty of fair representation. As noted above, Ms. Jay would have to find such a breach by the Union in addition to a breach of contract by Kaiser. She has failed to meet her burden.

"[A] union breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith.'" *Simo v. Union of Needletrades*, 316 F.3d 974, 981 (9th Cir. 2003). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991) (citations omitted). Where a union's conduct involves the exercise of judgment, rather than a purely ministerial act, a plaintiff "may prevail only if the union's conduct was discriminatory or in bad faith." *Moore v. Bechtel Power Corp.*, 840 F.2d 634, 636 (9th Cir. 1988).

When an employee alleges that a union failed to adequately investigate a grievance, the standard of review is highly deferential. The union only "acts 'arbitrarily' when it simply ignores a meritorious grievance or handles it in a perfunctory manner.'" *Peterson v. Kennedy*, 177 F.2d 1244, 1253-54 (9th Cir. 1985) (citing *Vaca v. Sipes*, 386 U.S. 171, 191 (1967)). The union need conduct only a "minimal investigation of a grievance that is brought to its attention." *Id.* at 1254 (quotation and citation omitted). Moreover, a union "need not process a meritless grievance." *Galindo v. Stoody Co.*, 793 F.2d 1502, 1513 (9th Cir. 1986).

Ms. Jay cannot meet her burden to show that a reasonable person could conclude, based on the evidence, that the Union's investigation was perfunctory. The Union was only required to undertake a "minimal investigation." *Peterson*, 177 F.2d at 1253. Her union representative, Mr. Mark Gong, complied with that barebones requirement. He reviewed the Letter of Agreement, the key document related to her educational obligations, and probed Ms. Jay about her progress in the certificate program. Gong Depo. 121:1-5, 123:19-23, 247:7-20; Jay Depo. 158:10-159:23. He met with Ms. Jay and with the Kaiser representatives twice. Gong Depo. 186:25-187:8; Gong

13

1  Decl. ¶¶ 9, 10; Jay Depo. 163:21-164:18. He attempted to seek an alternative position for her. Jay
2  Depo. 173:3-6; Gong Depo. 173:15-174:7. Though Ms. Jay claims Mr. Gong may have been
3  brusque and dismissive, Jay Decl. ¶¶ 24-25,[4] and though Mr. Gong ultimately concluded Kaiser
4  had just cause to terminate her, that is not sufficient to constitute a breach of the duty of
5  representation. This is not a case where an investigation was "minimal" or "perfunctory" because,
6  for example, the union departed from its normal investigatory process, *see Tenorio v. N.L.R.B.*,
7  680 F.2d 598, 602 (9th Cir. 1982), ignored the terms of an agreement between an employer and
8  employee, *see Rollins v. Community Hospital of San Bernardino*, 839 F.3d 1181, 1187 (9th Cir.
9  2016), or "ignored a *particularly strong argument*." *Peters v. Burlington Northern R. Co.*, 931
10 F.2d 534, 540 (9th Cir. 1990) (emphasis added). Indeed, the only argument that raises an arguably
11 colorable claim of breach by Kaiser is the waiver/estoppel/modification argument discussed
12 above. Even if one of those theories had some possible basis, it was not a "particularly strong
13 argument" the union was bound to raise. *Id.* Even Ms. Jay's lawyer failed to clearly articulate
14 such argument in this litigation; the union representative can hardly be faulted for not exploring
15 any such subtle theory *sua sponte*.[5]

16 Moreover, in reviewing the key documents and concluding that Kaiser had just cause to
17 terminate her, Mr. Gong exercised his judgment. Because the Union's exercise of its judgment is
18 entitled to a high degree of deference, Ms. Jay "may prevail only if the union's conduct was
19 discriminatory or in bad faith." *Moore*, 840 F.2d at 636. Ms. Jay is unable to present evidence of
20 either. She argues that Kaiser discriminated against her as an African-American woman by

---

[4] With respect to her first phone call with Mr. Gong, Ms. Jay explains, "[w]hen I tried to explain the history and background [of the LOA] to him, he cut me off and said 'you signed it.'" Jay Decl. ¶ 24. After this initial phone call, Ms. Jay sent the LOA to Mr. Gong, Mr. Gong reviewed the LOA, they had a second phone call, and they then met twice with Kaiser representatives, including meetings between Ms. Jay and Mr. Gong to prepare. Ms. Jay does not allege that through the course of this representation, Mr. Gong continued to refuse to permit her to share additional information with him or to take it into consideration. Thus, this is not a case where a union representative's refusal to receive or consider material information might evidence a perfunctory or inadequate investigation.

[5] Indeed, there is no evidence that Ms. Jay told Mr. Gong about either the August 2013 meeting with Mr. Finley and Mr. Marrow or the alleged periodic meetings with them at the beginning and end of each Laney semester.

14

permitting Mr. Jason Ponce additional time to complete his studies and by hiring, in 2017, Mr. Bruce Brunell as a Biomedical Engineer without an Associate's Degree. However, to prevail, Ms. Jay must show *the Union* was discriminatory, not Kaiser. Further, her allegations are not supported by evidence. Ms. Jay conceded that she did not inform Mr. Gong about her suspicions regarding Mr. Ponce when she spoke and met with him. Jay Depo. at 210. And as noted above, there is no competent evidence of such. Ms. Jay could not have informed anyone about Brunell's hiring, because it did not occur until well *after* her termination. A union does not breach its duty of fair representation where it is not aware of a contract violation. *See Bryant v. Int'l Union, United Mine Workers of Am.*, 467 F.2d 1, 5 (6th Cir. 1972).

Ms. Jay also alleges bad faith on the Union's part because the Union purportedly knew by the time she was terminated that the BET position would be eliminated in the forthcoming 2015 CBA, since negotiations had begun earlier that year. Ms. Jay argues that because negotiations were underway, the Union should have argued that the 2015 CBA thus somehow waived her educational requirements in the BET program. This argument, as explained above, is meritless because the parties to the agreement concur that the 2015 CBA was prospective, reflecting that no new people would be hired into the role – the 2015 CBA did not eliminate existing BETs, nor did it lower the already relaxed educational requirements for the BETs established in the LOA.[6] Moreover, as discussed earlier, the 2015 CBA did not take effect until September 15, 2015, two weeks after her August 31, 2015 deadline to meet the program's educational requirements. (The Agreement was not ratified until September 30, but was made retroactive to September 15.) Thus, even if the 2015 CBA eliminated the requirements as of September 15, it did not do so as of August 31, her compliance deadline.

---

[6] To argue that the Union acted in bad faith, Ms. Jay also pointed out that Kaiser had hired people into the Biomedical Engineer position who lacked an Associate's Degree despite the stated requirement. In particular, Ms. Jay claimed that "Finley believes 15% of the BMET's did not have associate degrees and 5% of the biomedical engineers did not have associate degrees." Opp. at 4:8-10 (citing Boyd Decl. ¶ 3, Ex. 3 at DEF 00251 (Gong's notes from the 2015 CBA negotiations)). However, this fact alone establishes nothing, because Ms. Jay was not required to obtain an Associate's Degree: she was only required to obtain a Certificate in Electronics. As the Union pointed out at the hearing, Ms. Jay could have been one of the exceptions had she completed her Certificate in Electronics in a timely manner.

In sum, Ms. Jay has failed to come forward with evidence that could demonstrate the existence of a triable issue of material fact with respect to the union's duty of fair representation, there is no evidence supporting a claim of any such breach.

### III. CONCLUSION

Because Ms. Jay has not come forward with evidence to support the existence of a triable issue of material fact with regard to whether Kaiser breached the collective bargaining agreement and whether the Union breached its duty of fair representation, the Court **GRANTS** the Union's motion for summary judgment.[7]

This order disposes of Docket Nos. 82 and 92. The Clerk is instructed to enter Judgment and close the file.

**IT IS SO ORDERED**.

Dated: August 25, 2017

_____
EDWARD M. CHEN
United States District Judge

---

[7] Ms. Jay also requested the Court take judicial notice of an arbitration award interpreting provisions of the 2015 CBA relating to the posting and bidding requirements for newly created biomedical engineering provisions. *See* Docket No. 92. Ms. Jay claimed the arbitration award "evidence[s] bad faith in that IUOE and Kaiser knew the falsity of their statements about no available positions that Ms. Jay was qualified to perform." Docket No. 92 at 4. However, that issue is immaterial. The arbitration award does not address whether there were open and available Biomedical *Assistant* positions (the only position Mr. Gong and Ms. Jay asked for in mediation), but rather, Biomedical *Engineer* positions, which were not requested in mediation and for which the record establishes Ms. Jay was not qualified. Indeed, she did not complete the BET program, which was intended to prepare her for that role. Because the contents of the award are immaterial to the issues here, the Court denies Ms. Jay's request as moot.

16